**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION**

| | | |
|---|---|---|
| **JAMES RODDEN,** | ) | |
| **ISAAC MCLAUGHLIN,** | ) | |
| **GABRIEL ESCOTO,** | ) | |
| **MICHELLE RUTH MORTON,** | ) | |
| **WADDIE BURT JONES,** | ) | |
| **RYAN CHARLES BIGGERS,** | ) | |
| **CAROLE LEANN MEZZACAPO,** | ) | |
| **EDWARD BRYAN SURGEON,** | ) | |
| **SUSAN REYNOLDS,** | ) | **MOTION FOR TRO AND** |
| **ROY KENNETH EGBERT,** | ) | **PRELIMINARY INJUNCTION** |
| **and GEORGE GAMMON,** | ) | **AND MEMORANDUM IN** |
| **on behalf of themselves and all others** | ) | **SUPPORT** |
| **similarly situated,** | ) | |
| | ) | |
| *Plaintiffs*, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| **DR. ANTHONY FAUCI, Chief COVID** | ) | |
| **Response Director of the National Institute** | ) | |
| **of Allergy and Infectious Diseases,** | ) | |
| **JEFFREY ZIENTS, Coordinator of the** | ) | |
| **COVID-19 Response, NATALIE** | ) | |
| **QUILLIAN, Deputy COVID-19 Response** | ) | |
| **Coordinator, DR. DAVID A. KESSLER,** | ) | |
| **Chief Science Office of COVID Response,** | ) | |
| **VICE ADMIRAL DR. VIVEK MURTHY,** | ) | |
| **Surgeon General of the U.S., ABBE** | ) | |
| **GLUCK, Special Counsel, EDUARDO** | ) | |
| **CISNEROS, Director of Intergovernmental** | ) | |
| **Affairs, BEN WAKANA, Director of** | ) | |
| **Strategic Communications and** | ) | |
| **Engagement, CLARKE HUMPHREY,** | ) | |
| **Digital Director, DR. CYRUS SHAPAR,** | ) | |
| **Data Director, DR. BECHARA** | ) | |
| **CHOUCAIR, Vaccinations Coordinator,** | ) | |
| **CAROLE JOHNSON, Testing** | ) | |
| **Coordinator, TIM MANNING, Supply** | ) | |
| **Coordinator, DR. ROCHELLE** | ) | |
| **WALENSKY, Director of the Centers for** | ) | |
| **Disease Control and Prevention, ROBIN** | ) | |

1

**CARNAHAN, Administrator of the U.S.** )
**General Services Administration, KIRAN** )
**AHUJA, Director U.S. Office of Personnel** )
**Management, DENIS MCDONOUGH,** )
**Secretary of Veterans Affairs, DEANNE** )
**CRISWELL, Director Federal Emergency** )
**Management Agency, L. ERIC** )
**PATTERSON, Director, Federal Protective** )
**Service, SHALANDA YOUNG, Acting** )
**Director of the Office of Management and** )
**Budget, JAMES M. MURRAY, Director** )
**U.S. SECRET SERVICE, WHITE HOUSE** )
**COVID-19 RESPONSE TEAM, SAFER** )
**FEDERAL WORKFORCE TASK** )
**FORCE, U.S. GENERAL SERVICES** )
**ADMINISTRATION, U.S. OFFICE OF** )
**PERSONNEL MANAGEMENT,** )
**DEPARTMENT OF VETERANS** )
**AFFAIRS, FEDERAL EMERGENCY** )
**MANAGEMENT AGENCY, FEDERAL** )
**PROTECTIVE SERVICE, OFFICE OF** )
**MANAGEMENT AND BUDGET,** )
**UNITED STATES SECRET SERVICE,** )
**and THE UNITED STATES OF** )
**AMERICA,** )
)
*Defendants.* )

## MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

Pursuant to Federal Rule of Civil Procedure 65, Plaintiffs, James Joseph Rodden, Isaac Lee McLaughlin, Gabriel Escoto, Michelle Ruth Morton, Waddie Burt Jones, Ryan Charles Biggers, Carole LeAnn Mezzacapo, Edward Bryan Surgeon, Susan Reynolds, Roy Kenneth Egbert, and George Gammon ("Plaintiffs") by and through undersigned counsel, file this Motion for a Temporary Restraining Order and Preliminary Injunction ("TRO") against Dr. Anthony Fauci, Jeffrey Zients, Natalie Quillian, Dr. David A. Kessler, Vice Admiral Dr. Vivek Murthy, Abbe Gluck, Eduardo Cisneros, Ben Wakana, Clarke Humphrey, Dr. Cyrus Shapar, Dr. Bechara Choucair, Carole Johnson, Tim Manning, Dr. Rochelle Walensky, Robin Carnahan, Kiran Ahuja, Denis McDonough, Deanne Criswell, L. Eric Patterson, Shalanda Young, James M. Murray (all named in their official capacity only), "White House Covid-19 Response Team," the Task Force (formally known as the "Safer Federal Workforce Task Force"), United States General Services Administration, United States Office of Personnel Management, Department of Veterans Affairs, FEMA, Federal Protective Service, OMB, United States Secret Service  and the United States of America (collectively "Defendants) seeking to enjoin the enforcement of the mandatory vaccination provisions issued by the Defendants, and President Biden's Executive Order 14043 ("E.O. 14043") (collectively, "Vaccine Mandate").  Plaintiffs make this motion to prevent violations of their bodily integrity and constitutional and statutory rights to informed consent as a result of unlawful pressure wielded upon them by Defendants in this

action, and without which they will be irreparably harmed before the case can be adjudicated.

As set forth in the accompanying Motion and Memorandum in Support, Plaintiffs have met their burden of showing a TRO for 14 days and Preliminary Injunction thereafter should issue:

*First*, they have established a likelihood of success on the merits because the Vaccination Mandate conflicts with the federal Emergency Use Authorization statute, and ("EUA") violates Plaintiffs' bodily integrity and right to decline medical treatment and right to informed consent.  It also should be set aside under the APA as arbitrary and capricious.

*Second*, Plaintiffs have shown that, absent an injunction and/or TRO, they will suffer irreparable harm as a result of ongoing violations of their Constitutional and statutory rights, and because, if they cave and get the vaccine, the effects thereof cannot be undone.

*Third*, as the prospective injury to Plaintiffs outweighs any damage the proposed injunction may cause Defendants (which is none, because there is no evidence at all that those with naturally acquired immunity spread COVID-19 and certainly not at higher rates than the vaccinated), the balance of equities strongly favor an injunction.  Likewise, Defendants have no legitimate interest in enforcing an unconstitutional act and so it serves the public interest.

For these reasons and those set forth in this Motion and Memorandum, the Court should issue a TRO for 14 days and follow with a preliminary injunction thereafter enjoining Defendants from enforcing the Vaccine Mandate.

2

## TABLE OF CONTENTS

MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION ..................................................................................................... 1

TABLE OF CONTENTS ................................................................................................ i

TABLE Of AUTHORITIES............................................................................................ ii

INTRODUCTION ......................................................................................................... 3

FACTS .......................................................................................................................... 3

    I.     The Representative Plaintiffs ................................................................. 3

    II.    The Coronavirus and Development of Vaccines ................................... 5

    III.   The Federal EUA Statute ...................................................................... 7

    IV.   The Federal Vaccine Mandate ............................................................. 9

    V.    Prior Infection Leads to Naturally Acquired Immunity to COVID-19 at Least as Robust as Vaccine-Acquired Immunity ........................................ 12

    VII.  Plaintiffs Have Experienced, and Will Continue to Experience, Concrete and Particularized Harm as a Direct Consequence of the Federal Employee Vaccine Mandate ...................................................................................................... 17

ARGUMENT................................................................................................................ 19

    I.     Plaintiffs Have a Substantial Likelihood of Success on the Merits ..................... 19

    II.    Plaintiffs Will Likely Suffer Irreparable Harm Should the TRO Not Be Granted 27

    III.   The Threatened Injury Outweighs Any Harm to Defendants from Grant of the TRO. 29

    IV.   The Grant of a TRO Will Serve the Public Interest............................................ 30

CONCLUSION ............................................................................................................ 30

# TABLE OF AUTHORITIES

**Cases**

*Ass'n of Taxicab Operators*, 760 F. Supp.2d 693, (N.D. Tex. 2010)................................ 27

*Assets Work, Inc. v. City of Cincinnati*, 2003 WL 25463096 (W.D. Texas)..................... 21

*Awad v. Ziriax*, 670 F.3d 1111, (10th Cir. 2012) ............................................................. 29

*Canal Aut. Of the State of Fla. v. Callaway*, 489 f.2d 567, (5th Cir. 1974)..................... 19

*Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 543
    (6th Cir. 2007)................................................................................................................ 27

*Cho v. Itco, Inc.*, 782 F.Supp. 1183, 1185 (E.D. Tex. 1991)............................................. 27

*Citizens for Responsibility & Ethics in Wash. v. Office of Admin.*, 249 F.R.D. 1 (D.C. Cir.
    2008)............................................................................................................................... 22

*Coalition for Economic Equity v. Wilson*, 122 F.3d 692, 699 (9th Cir. 1997)................. 29

*Cruzan v. Dir., Mo. Dep't of Public Health*, 497 U.S. 261, 278 (1990) .......................... 24

*Deerfield Med. Ctr. v. Deerfield Beach*, 661 F.2d 328, 338 (5th Cir. 1981) ................... 29

*Dennis Melancon, Inc. v. City of New Orleans*, 703 F.3d 262, 279 (5th Cir. 2012)......... 28

*Dialysis Patient Citizens v. Burwell*, 2017 WL 365271 (E.D. Tex. Jan. 25, 2017) ......... 19

*Does v. Munoz*, 507 F.3d 961, 964 (2007) ....................................................................... 25

*Fla. Med. Ass'n v. U.S. Dep't of Health, Ed. & Welfare,* 601 F.2d 199 (5th Cir. 1979) .. 19

*Int'l, Inc. v. Corporacion Estatal Petrolera Ecuatoriana*, 762 F.2d 464, 472 (5th Cir.
    1985)............................................................................................................................... 28

*Jackson Women's Health Org. v. Currier*, 760 F.3d 448, 452 (5th Cir. 2014)........... 29, 30

*Jacobson v. Massachusetts,* 197 U.S. 11 (1905) ............................................................. 25

*John Doe No. 1 v. Rumsfeld*, No. Civ. A. 03-707(EGS), 2005 WL 1124589, *1 (D.D.C.
    Apr. 6, 2005................................................................................................................... 21

*King v. Rubenstein*, 825 F.3d 206, 222 (4th Cir. 2016)................................................... 24

*Lakedreams v. Taylor*, 932 F.2d 1103, 1109 n.11 (5th Cir. 1991) .................................. 27

*Mohamed v. Holder*, 266 F. Supp. 3d 868, 877 (E.D. Va. 2017)..................................... 25

*Motor Vehicle Mfrs. Ass'n of U.S. Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43
    (1983) ............................................................................................................................. 26

*N.Y. Progress & Protection PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013) ............... 30

*Productos Carnic, S.A. v. Cent. Am. Beef & Seafood Trading Co.*, 621 F.2d 683, 686 (5th
    Cir. 1980) ....................................................................................................................... 27

*Rodden v. Fauci*, Case No. ___, Dkt. 1 (S.D. Texas 2021) at ¶¶ 67-91; Joint Decl. ¶¶ 15-
    24 ....................................................................................................................... 12, 15, 20

*Schloendorff v. Society of N.Y. Hosp.*, 211 N.Y. 125, 129-130, 105 N.E. 92, 93 (1914)
    (Cardozo, J.)................................................................................................................... 24

*TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) ................................................................ 23

*Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981) ................................................... 27

*Vacco v. Quill*, 521 U.S. 793, 807 (1997) ....................................................................... 24

*Washington v. Glucksberg,* 521 U.S. 702, 722 n.17 (1997) ............................................. 24

*Washington v. Harper*, 494 U.S. 210, 229 (1990).......................................................... 24

**Other Authorities**

"Laboratory-Confirmed COVID-19 Among Adults Hospitalized with COVID-19 Like
Illness," *CDC* (Oct. 29, 2021) .......................................................................... 14

"Memorandum Opinion for the Deputy Counsel to the President," *Whether Section 564
of the Food, Drug, and Cosmetic Act Prohibits Entities from Requiring the Use of a
Vaccine Subject to an Emergency Use Authorization* (July 6, 2021) (OLC Op.) at 7-13,
.............................................................................................................. 22, 23

"Science Brief: SARA-CoV-2 Infection-induced and Vaccine-induced Immunity," *CDC*
(Oct. 29, 2021) ................................................................................................. 15

Alexander Smith, *China on 'High Alert' as Variant of Covid-19 Spreads to 5 Provinces*,
NBCNEWS.COM (July 30, 2021) ........................................................................ 15

*also* FDA, *FDA Approves First COVID-19 Vaccine*, (Aug. 23, 2021).............................. 7

Angeli *et al.*, *SARS-CoV-2 Vaccines: Lights and Shadows*, 88 EUR. J. INTERNAL MED. 1,
8 (2021) ............................................................................................................. 9

CDC, *Understanding the Regulatory Terminology of Potential Preventions and
Treatments for COVID-19* (Oct. 22, 2020) ....................................................... 8

Chao Deng, *As Delta Variant Spreads, China Lacks Data on Its Covid-19 Vaccines*,
WALL ST. J. (July 9, 2021) .............................................................................. 16

David Rosenberg, *Natural Infection vs Vaccination: Which Gives More Protection*?
ISRAELNATIONALNEWS.COM (Jul. 13, 2021).................................................... 13

FDA, *Emergency Use Authorization for Vaccines Explained* (Nov. 20, 2020)................. 8

https://www.saferfederalworkforce.gov/ (last visited Oct. 29, 2021) .............................. 10

Martin Kulldorff, "A Review and Autopsy of Two COVID Immunity Studies,"
*Brownstone Institute* (Nov. 2, 2021) .............................................................. 14

Matt D.T. Hitchings, et al., *Effectiveness of CoronaVac in the Setting of High SARS-Cov-
2 P.1 Variant Transmission in Brazil: A Test-Negative Case-Control Study*, THE
LANCET (July 25, 2021), .................................................................................. 16

Nathan Jeffay, *Israeli, UK Data Offer Mixed Signals on Vaccine's Potency Against Delta
Strain*, THE TIMES OF ISRAEL (July 22, 2021)................................................. 13

*Recommendation for an Emergency Use Listing of AZD1222 Submitted by AstraZeneca
AB and Manufactured by SK Bioscience Co. Ltd.*, WHO (Feb. 23, 2021) .................. 16

*Recommendation on Emergency Use Listing on COVISHIELD Submitted by SIIPL*, WHO
(Feb. 26, 2021), ................................................................................................. 16

Robert H. Shmerling, MD, *First, Do No Harm*, Harvard Health Blog, Harvard Health
Publishing, Harvard Medical School (June 22, 2020) .................................... 20

Tab Enforcement of Vaccination Requirement for Employees (Updated) ("Employees
covered by Executive Order 14043 who fail to comply with a requirement to be fully

vaccinated or provide proof of vaccination and have neither received an exception nor have an exception request under consideration, are in violation of a lawful order. Employees who violate lawful orders are subject to discipline, up to and including termination or removal.").............................................................................. 12

Tab Vaccination Requirements for Federal Employees (New and Updated) .................. 11

W. Keeton, D. Dobbs, R. Keeton, & D. Owen, PROSSER AND KEETON ON LAW OF TORTS § 9, pp. 39-42 (5th ed. 1984).)...................................................................................... 24

*WHO Validates Sinovac COVID-19 Vaccine for Emergency Use and Issues Interim Policy Recommendations*, WHO.INT (June 1, 2021), ..................................................... 15

Wright, A. Miller, & Mary Kay Kane, *Federal Practice and Procedure*, § 2948.1 at 161 (2d ed. 1995) ......................................................................................................... 29

Yaroslav Trofimov & Summer Said, Bahrain, *Facing a Covid Surge, Starts Giving Pfizer Boosters to Recipients of Chinese Vaccine*, WALL ST. J. (June 2, 2021) ...................... 16

## Rules

21 U.S.C. § 360bbb-3(e)(1)(A)(ii) ............................................................................. 21, 22

## Regulations

86 Fed. Reg. at 50,989 ("The Safer Federal Workforce Task Force (Task Force), established by Executive Order 13991 of January 20, 2021............................................ 10

Executive Order 14,043 entitled "Requiring Coronavirus Disease 2019 Vaccination for Federal Employees," *published as* 86 Fed. Reg. 50,989 (Sept. 14, 2021) ("EO 14,043") ............................................................................................................... 10

## INTRODUCTION

As employees of the Federal Government, Plaintiffs, all of whom have recovered from Covid-19 and demonstrated their naturally acquired immunity to Covid-19 through serological testing, must nonetheless receive a COVID-19 vaccine by November 8, 2021 at the latest.  Indeed, at this time, only by immunization with a single shot "emergency use" vaccine can Plaintiffs meet Defendants' arbitrary deadlines.  Should they refuse to receive the vaccine after "counseling" and other administrative processes, they may be terminated no later than November 28, 2021.  Only the intervention of this Court can prevent the irreparable harm of receiving what is the equivalent of forced vaccination, without informed consent, before the Court can rule on the lawfulness of this unprecedented Government and Agency overreach.  Accordingly, Plaintiffs request that the Court grant their motion for a TRO to preserve the perfectly safe status quo.

## FACTS

### I.   THE REPRESENTATIVE PLAINTIFFS

Plaintiff James Rodden is an Assistant Chief Counsel at U.S. Immigration and Customs Enforcement, part of the Department of Homeland Security.  He resides in Frisco, Texas and has worked for the federal government for 11 years.  *See* 11/4/21 Declaration of James Rodden in Support of TRO ("Rodden Decl.") ¶¶1-12 (Attachment 1).

Plaintiff Isaac McLaughlin, an electronics technician, is a civilian employee of the Department of the Navy.  He resides in Robstown, Texas and has worked for the federal government for 15 years.  *See* 11/3/21 Declaration of Isaac McLaughlin in Support of TRO ("McLaughlin Decl.") ¶¶  1-12 (Attachment 2).

3

Plaintiff Gabriel Escoto is a resident of Midland Texas, and a civilian employee of U.S. Immigration and Customs Enforcement, part of the Department of Homeland Security.  *See* 11/4/21 Declaration of Gabriel Escoto in Support of TRO ("Escoto Decl.") ¶¶ 1-12 (Attachment 3).

Plaintiff Michelle Ruth Morton is an air traffic controller for the Federal Aviation Administration, part of the Department of Transportation.  She resides in St. Cloud, Florida and has worked for the federal government for 14 years.  *See* 11/4/21 Declaration of Michelle Morton in Support of TRO ("Morton Decl.") ¶¶ 1-12  (Attachment 4).

Plaintiff Waddie Burt Jones, is a resident of Georgia, and is a civilian employee of The U.S. Department of Agriculture, where he has worked for 9 years.  *See* 11/4/21 Declaration of Waddie Jones in Support of TRO ("Jones Decl.") ¶¶ 1-12 (Attachment 5).

Plaintiff Ryan Biggers is also a special agent with the Secret Service.  He resides in Springfield, Virginia and has worked for the federal government for 18 years.  *See* 11/4/21 Declaration of Ryan Biggers in Support of TRO ("Biggers Decl.") ¶¶ 1-12 (Attachment 6).

Plaintiff Carole Mezzacapo is a resident of Louisianna, and a civilian employee of U.S. Immigration and Customs Enforcement, and works as an Enforcement and Removal Assistant.  She has worked for the agency for 22 years.  *See* 11/3/21 Declaration of Carole Mezzacapo in Support of TRO ("Mezzacapo Decl.") ¶¶ 1-12 (Attachment 7).

Plaintiff Edward Bryan Surgeon is a District Veterinary Medical Specialist with the U.S. Department of Agriculture.  He resides in Cummings, Georgia and has worked for the federal government for 25 years.  *See* 11/3/21 Declaration of Edward Surgeon in Support of TRO ("Surgeon Decl.") ¶¶ 1-12 (Attachment 8).

4

Plaintiff Dr. Susan Reynolds is a supervisor of food safety inspectors at the Department of Agriculture.  She resides in Cummings, Georgia and has worked for the federal government for 10 years.  *See* 11/3/21 Declaration of Dr. Susan Reynolds in Support of TRO ("Reynolds Decl.") ¶¶ 1-12 (Attachment 9).

Plaintiff Roy Kenneth Egbert, II is a resident of Brick, New Jersey and works for the U.S. Immigration and Customs Enforcement.  *See* 11/4/21 Declaration of Roy Kenneth Egbert, II in Support of TRO ("Egbert Decl.") (Attachment 10) ¶¶ 1-12 (Attachment 10).

Plaintiff George Gammon is a supervisory air marshal for the Transportation Security Administration, also part of the Department of Homeland Security.  He resides in Palos Verdes, California and has worked for the federal government for 10 years.  *See* 11/4/21 Declaration of George Gammon in Support of TRO ("Gammon Decl.") ¶¶ 1-12 (Attachment 11).

All Plaintiffs wish to rely on their naturally acquired immunity, and to preserve their rights to bodily integrity and to make medical decisions through informed consent.  They will suffer irreparable harm if forced to take a vaccine before their rights are adjudicated. *See* Plaintiffs' Declarations, Attachments 1-11.

## II.    THE CORONAVIRUS AND DEVELOPMENT OF VACCINES

The novel coronavirus SARS-CoV-2, which can cause the disease COVID-19, is a contagious virus spread mainly from person-to-person, including through the air.  It is well settled that the coronavirus presents a significant risk primarily to individuals aged 70 or older and those with comorbidities such as obesity and diabetes.  Bhattacharya and

Kulldorff Joint Declaration ¶¶ 10-14 ("Joint Decl.") (Attachment A of Complaint).  In fact, a meta-analysis published by the WHO concluded that the survival rate for COVID-19 patients under 70 years of age was 99.95%.  *Id.* ¶ 12.  CDC estimates that the survival rate for young adults between 20 and 49 is 99.95%, and for people ages 50-64 is 99.4%.  Joint Decl. ¶ 12.

In response to Covid-19, three separate coronavirus vaccines have been developed and approved more swiftly than any other vaccines in our nation's history.  The Food and Drug Administration ("FDA") issued an Emergency Use Authorization ("EUA") for the Pfizer-BioNTech COVID-19 Vaccine ("BioNTech Vaccine") on December 11, 2020.[1]  Just one week later, FDA issued a second EUA for the Moderna COVID-19 Vaccine ("Moderna Vaccine").[2]  FDA issued its most recent EUA for the Johnson & Johnson Vaccine ("Janssen Vaccine") on February 27, 2021 (the only EUA for a single-shot vaccine).[3]

FDA fully approved the Pfizer Comirnaty Vaccine ("Comirnaty Vaccine") on August 23, 2021.  In a letter to Pfizer, FDA states that "the Pfizer-BioNTech COVID-19 Vaccine that uses PBS buffer and COMIRNATY (COVID-19 Vaccine, mRNA) have the same formulation. The products are legally distinct with certain differences that do not impact safety or effectiveness." (emphasis added).  FDA, "Letter to Pfizer, Inc." (October 29, 2021), .

---

[1] *Pfizer-BioNTech Vaccine FAQ*, FDA, bit.ly/3i4Yb4e (last visited Oct. 29, 2021).

[2] *Moderna, About Our Vaccine*, bit.ly/2Vl4lUF (last visited Oct. 29, 2021).

[3] *EUA for Third COVID-19 Vaccine*, FDA, bit.ly/3xc4ebk (last visited Oct. 29, 2021).

Yet, the vaccines are not actually identical formulaically.  For example, the two vaccines have a different number of ingredients: Comirnaty has eleven ingredients while Pfizer-BioNTech has just ten.  FDA, "Vaccine Information Fact Sheet for Recipients and Caregivers about COMIRNATY (COVID-19 Vaccine, mRNA) and Pfizer-BioNTech COVID-19 Vaccine to Prevent Coronavirus Disease 2019 (COVID-19)" (Aug. 23, 2021), *available at* https://www.fda.gov/media/151733/download (last viewed Nov. 1, 2021).

The Comirnaty Vaccine is *not* widely available due to limited supply, as Pfizer also notes that "there is not sufficient approved vaccine [the Comirnaty] available for distribution to this population in its entirety at the time of the reissuance of this EUA." FDA, "Letter to Pfizer, Inc." (October 29, 2021), *available at* https://www.fda.gov/media/150386/download (last visited Nov. 4, 2021).  *See also* FDA, *FDA Approves First COVID-19 Vaccine*, (Aug. 23, 2021), *available at* https://www.fda.gov/news-events/press-announcements/fda-approves-first-covid-19-vaccine (last visited Oct. 29, 2021).

## III.    THE FEDERAL EUA STATUTE

The EUA status of the vaccines that are available at present in the United States means that FDA has not yet fully approved them but permits their conditional use nonetheless due to exigent circumstances.  The standard for EUA review and approval is lower than that required for full FDA approval.  Typically, vaccine development includes six stages: (1) exploratory; (2) preclinical (animal testing); (3) clinical (human trials); (4) regulatory review and approval; (5) manufacturing; and (6) quality control.  *See* CDC, *Vaccine Testing*

*and the Approval Process* (May 1, 2014), *available at* https://bit.ly/3rGkG2s (last visited Oct. 29, 2021).  The third phase generally takes place over years, because it can take that long for a new vaccine's side effects to manifest, and must be followed by a period of regulatory review and approval, during which data and outcomes are peer-reviewed and evaluated by FDA.   *Id.* Finally, to achieve full approval, the manufacturer must demonstrate that it can produce the vaccine under conditions that assure adequate quality control.    FDA must then determine, based on "substantial evidence," that the medical product is effective and that its benefits outweigh its risks when used in accordance with the product's approved labeling. *See* CDC, *Understanding the Regulatory Terminology of Potential Preventions and Treatments for COVID-19* (Oct. 22, 2020), *available at* bit.ly/3x4vN6s (last visited Oct. 29, 2021).

In contrast to this rigorous, six-step approval process that includes long-term data review, FDA grants EUAs in emergencies to "facilitate the availability and use of medical countermeasures, including vaccines, during public health emergencies, such as the current COVID-19 pandemic." FDA, *Emergency Use Authorization for Vaccines Explained* (Nov. 20, 2020), *available at* bit.ly/3x8wImn (last visited Oct. 29, 2021).  EUAs allow FDA to make a product available to the public based on the best available data, without waiting for all the evidence needed for full approval.  *See id.*

The EUA statute lays out the: "Appropriate conditions designed to ensure that individuals to whom the product is administered are informed."  This means recipients must be told:

> (i) that the Secretary has authorized the emergency use of the product;
> (ii) of the significant known and potential benefits and risks of such use, and of the extent to which such benefits and risks are unknown; and
> (iii) *of the option to accept or refuse administration of the product*, of the consequences, if any, of refusing administration of the product, and of the alternatives to the product that are available and of their benefits and risks.

21 U.S.C. § 360bbb-3(e)(1)(A)(i)(emphasis added).

None of the precise EUA vaccines approved for use in the United States has been tested in clinical trials for its safety and efficacy on individuals who have recovered from COVID-19, *e.g.* those with natural immunity (such as Plaintiffs). Indeed, trials conducted so far have *specifically excluded* survivors of previous COVID-19 infections. Noorchashm Decl. ¶ 28 (Attachment B of Complaint). Recent research indicates that vaccination presents a heightened risk of adverse side effects—including serious ones—to those who have previously contracted and recovered from COVID-19. Noorchashm Decl. ¶¶ 21-26; Joint Decl. ¶ 28. The heightened risk of adverse effects results from "preexisting immunity to SARS-Cov-2 [that] may trigger unexpectedly intense, albeit relatively rare, inflammatory and thrombotic reactions in previously immunized and predisposed individuals." Angeli *et al*., *SARS-CoV-2 Vaccines: Lights and Shadows*, 88 Eur. J. Internal Med. 1, 8 (2021).

## IV.   THE FEDERAL VACCINE MANDATE

On September 9, 2021, President Biden issued Executive Order 14,043 entitled "Requiring Coronavirus Disease 2019 Vaccination for Federal Employees," *published as*

86 Fed. Reg. 50,989 (Sept. 14, 2021) ("EO 14,043"), proclaiming that "it is necessary to require COVID-19 vaccination for all Federal employees, subject to such exceptions as required by law."[4]

The Federal Work Force Task Force ("Task Force") was designated to serve as the intermediate enforcer of EO 14,043 (with the employing agencies subject to Task Force regulation being the ones left to directly interface with their employees). *See* 86 Fed. Reg. at 50,989 ("The Safer Federal Workforce Task Force (Task Force), established by Executive Order 13991 of January 20, 2021 (Protecting the Federal Workforce and Requiring Mask-Wearing), has issued important guidance to protect the Federal workforce and individuals interacting with the Federal workforce.").

Specifically, since September 9, 2021, the Task Force has issued a *shifting set* of guidance instructions, published on the Task Force's website, designed to coerce federal workers into taking one of the EUA-approved vaccines ("Task Force Guidance"). *See* https://www.saferfederalworkforce.gov/ (last visited Oct. 29, 2021). The Task Force Guidance contains a number of important features, but for present purposes the most critical is that it states, *in mandatory terms*, that "Federal employees need to be fully vaccinated *by* *November* *22,* *2021.*" https://www.saferfederalworkforce.gov/faq/vaccinations/ (last visited Oct. 20, 2021) (emphasis added). However, the Task Force Guidance considers no one "fully vaccinated"

---

[4] This Executive Order and the actions by federal agencies and agents of the federal government designed to enforce the Executive Order are collectively referred to herein as the "Vaccine Mandate."

until "2 weeks *after* they have received the requisite number of doses of a COVID-19 vaccine approved or authorized for emergency use …." *Id.* at Tab Vaccination Requirement for Federal Employees (New and Updated) (emphasis added).

Working backwards, this means that the Vaccine Mandate, implemented by the Task Force (and other federal agents), in reality establishes an imminent vaccination deadline of *November 8, 2021*. *See* Complaint, Introduction ¶¶ f-i. Plaintiffs have been left with no viable option but to bring this class action suit and seek temporary and/or preliminary injunctive relief depending the resolution of this litigation on the merits.

The Vaccine Mandate does not exempt employees who are work remotely or those employees with naturally acquired immunity (such as Plaintiffs here).  Shockingly, compliance with the Vaccine Mandate can be achieved by receiving any vaccine "that has been listed for emergency use by the World Health Organization [WHO]," *id.* at Tab Vaccination Requirements for Federal Employees (New and Updated), *available at* https://www.saferfederalworkforce.gov/faq/vaccinations/ (last visited Oct. 29, 2021).  The Vaccine Mandate can thus be satisfied by taking foreign vaccines that the FDA has *not approved in any fashion*, such as the Sinovac and Sinopharm Vaccines.  These vaccines are demonstrably inferior to naturally acquired immunity in terms of preventing a coronavirus infection.  *See infra*, Section V.

Those who do not comply with the Federal Employee Vaccine Mandate by the aggressive deadlines discussed above face severe disciplinary action, *including termination of employment*.  *See id.* at Tab Enforcement of Vaccination Requirement for Employees (Updated) ("Employees covered by Executive Order 14043 who fail to comply with a

11

requirement to be fully vaccinated or provide proof of vaccination and have neither received an exception nor have an exception request under consideration, are in violation of a lawful order.  Employees who violate lawful orders are subject to discipline, up to and including termination or removal.").

All of the Plaintiffs have already contracted and fully recovered from COVID-19. As a result, they possess naturally acquired immunity, confirmed by recent SARS-CoV-2 antibody tests.  The declarations submitted with the Complaint demonstrate that there is no need for them to be vaccinated and indeed it's contraindicated.  *See* Plaintiffs' Declarations (Attachments 1-11); Decl. of Dr. Sam Pappas (Attachment C of Complaint) ¶¶ 10-13.

## V.   PRIOR INFECTION LEADS TO NATURALLY ACQUIRED IMMUNITY TO COVID-19 AT LEAST AS ROBUST AS VACCINE-ACQUIRED IMMUNITY

As laid out more extensively in Plaintiffs' complaint, naturally acquired immunity developed after recovery from COVID-19 provides broad and robust protection against severe disease from subsequent SARS-CoV-2 infection. *See Rodden v. Fauci*, Case No. ___, Dkt. 1 (S.D. Texas 2021) at ¶¶ 67-91; Joint Decl. ¶¶ 15-24.  In fact, a study from Israel found that *vaccinated* individuals had 13.1 times greater risk of testing positive, 27 times greater risk of symptomatic disease, and around 8.1 times greater risk of hospitalization than *unvaccinated* individuals with naturally acquired immunity.  Joint Decl. ¶ 20. The authors concluded that the "study demonstrated that natural immunity confers longer lasting and stronger protection against infection, symptomatic disease and hospitalization caused by the Delta variant of SARS-CoV-2, compared to the BNT162b2 [BioNTech's

research name] two-dose vaccine-induced immunity."  Joint Decl. ¶ 20.   Recent Israeli data found that those who had received the BioNTech Vaccine were 6.72 times *more likely* to suffer a subsequent infection than those with natural immunity. David Rosenberg, *Natural Infection vs Vaccination: Which Gives More Protection*? ISRAELNATIONALNEWS.COM (Jul. 13, 2021), *available at* https://www.israelnationalnews.com/News/News.aspx/309762 (last visited Oct. 29, 2021). Israeli data also shows that the protection BioNTech grants against infection is short-lived compared to natural immunity, while also degrading significantly faster.  As of July 2021, vaccine recipients from January 2021 exhibited only 16% effectiveness against infection and 16% protection against symptomatic infection, increasing linearly until reaching a level of 75% for those vaccinated in April. *See* Nathan Jeffay, *Israeli, UK Data Offer Mixed Signals on Vaccine's Potency Against Delta Strain*, THE TIMES OF ISRAEL (July 22, 2021), *available at* bit.ly/3xg3uCg (last visited Oct. 29, 2021).

While the CDC and the media have touted a study from Kentucky as proof that those with naturally acquired immunity should get vaccinated, that study says no such thing.  The study did not even compare vaccinated individuals to COVID-recovered individuals.  True, the study showed slightly higher antibody levels in those with naturally acquired immunity who had been vaccinated, as opposed to those who possessed naturally acquired immunity alone.  That finding does not translate into a clinical benefit: "[t]his does not mean that the vaccine increases protection against symptomatic disease, hospitalizations or deaths." Joint Decl. ¶ 37.  Furthermore, the study "did not address or attempt to quantify the magnitude of risk and adverse effects in its comparison groups," Noorchashm Decl. ¶¶ 29-31.

The CDC has also claimed that another study, of several thousand patients hospitalized with "covid-like illness," demonstrates the superiority of vaccine-achieved immunity.  "Laboratory-Confirmed COVID-19 Among Adults Hospitalized with COVID-19 Like Illness," *CDC* (Oct. 29, 2021), *available at* https://www.cdc.gov/mmwr/volumes/70/wr/mm7044e1.htm (last visited Nov. 3, 2021). Numerous exerts have pointed out the flaws in this study,  chief among them is that it did not actually address whether the COVID-19 recovered patients benefit from being vaccinated.  *See* Martin Kulldorff, "A Review and Autopsy of Two COVID Immunity Studies," *Brownstone Institute* (Nov. 2, 2021), *available at* https://brownstone.org/articles/a-review-and-autopsy-of-two-covid-immunity-studies/ (last visited Nov. 3, 2021).  Rather, "the CDC study answers neither the direct question of whether vaccination or Covid recovery is better at decreasing the risk of subsequent Covid disease, nor whether the vaccine rollout successfully reached the frail.  Instead, it asks which of these two has the greater effect size.  It answers whether vaccination or Covid recovery is more related to Covid hospitalization or if it is more related to other respiratory type hospitalizations." *Id.*

Indeed, shortly after publishing the results of the study, the CDC (much more quietly) conceded that: "A systematic review and meta-analysis including data from three vaccine efficacy trials and four observational studies from the US, Israel, and the United Kingdom, found no significant difference in the overall level of protection provided by infection as compared with protection provided by vaccination; this included studies from both prior to and during the period in which Delta was the predominant variant." "Science

14

Brief: SARA-CoV-2 Infection-induced and Vaccine-induced Immunity," *CDC* (Oct. 29, 2021), *available at* https://www.cdc.gov/coronavirus/2019-ncov/science/science-briefs/vaccine-induced-immunity.html (last visited Nov. 3, 2021).In short, contrary to many of the claims made directly by the CDC and by the media it misled, these studies do *not* establish a valid reason to mandate vaccination of individuals with naturally acquired immunity. *See* Joint Decl. ¶ 37; Noorchashm Decl. ¶¶ 29-31.

Furthermore, the Vaccine Mandate considers several vaccines adequate to fulfill its requirements that provide significantly less protection than naturally acquired immunity, as explained in greater detail in Plaintiffs' Complaint. *See Rodden v. Fauci*, Dkt. 1 at ¶¶ 92-99. For example, the Janssen Vaccine provides immunity protection of somewhere between 66% and 85%, far below that conferred by natural immunity. Joint Decl. ¶ 16; Noorchashm Decl. ¶ 15. Worse yet, the Chinese Sinovac Vaccine has been approved by WHO (making it adequate to satisfy Task Force's policy), even though WHO itself determined that this vaccine prevented *symptomatic* disease in just 51% of those who received it (e.g. a sparse 50% efficacy rate). *See WHO Validates Sinovac COVID-19 Vaccine for Emergency Use and Issues Interim Policy Recommendations*, WHO.INT (June 1, 2021), *available at* bit.ly/3yitIW7 (last visited Oct. 28, 2021).

Real-world evidence also suggests that the Sinovac Vaccine provides only minimal protection against the Delta variant. *See* Alexander Smith, *China on 'High Alert' as Variant of Covid-19 Spreads to 5 Provinces*, NBCNEWS.COM (July 30, 2021), *available at* nbcnews.to/2VcK3NB (last visited Oct. 29, 2021); Chao Deng, *As Delta Variant Spreads, China Lacks Data on Its Covid-19 Vaccines*, WALL ST. J. (July 9, 2021), *available at*

on.wsj.com/3rMjlXW (last visited Oct. 29, 2021); Matt D.T. Hitchings, et al., *Effectiveness of CoronaVac in the Setting of High SARS-Cov-2 P.1 Variant Transmission in Brazil: A Test-Negative Case-Control Study*, THE LANCET (July 25, 2021), *available at* bit.ly/3C6F41J (last visited Oct. 29, 2021).

The Sinopharm Vaccine, also from China, has likewise received WHO approval. Because of the Sinopharm Vaccine's poor performance, several countries have stopped using it altogether. *See* Yaroslav Trofimov & Summer Said, Bahrain, *Facing a Covid Surge, Starts Giving Pfizer Boosters to Recipients of Chinese Vaccine*, WALL ST. J. (June 2, 2021), *available at* on.wsj.com/3ljM0lX (last visited Oct. 29, 2021).

The COVISHIELD vaccine, manufactured by the Serum Institute of India and South Korea's SK Bioscience Co., Ltd., is also WHO-approved and thus recognized as adequate to satisfy the Federal Employee Vaccine Mandate. The WHO itself reported a mere 70.42% efficacy against *symptomatic* COVID-19 infection, which fell to 62.10% in individuals who received two standard doses. *See Recommendation on Emergency Use Listing on COVISHIELD Submitted by SIIPL*, WHO (Feb. 26, 2021), *available at* bit.ly/3rNjnPo (last visited Oct. 29, 2021); *Recommendation for an Emergency Use Listing of AZD1222 Submitted by AstraZeneca AB and Manufactured by SK Bioscience Co. Ltd.*, WHO (Feb. 23, 2021), *available at* bit.ly/3yiQD3s (last visited Oct. 29, 2021).  None of these vaccines has been approved by the FDA for use in the United States and, as such *are not readily available to the Plaintiffs or anyone else*.  None of them obtains the level of protection that natural immunity does—or that the Plaintiffs have—but the Vaccine Mandate exempts

Federal employees who have had them from being vaccinated with an EUA vaccine. This is the very definition of arbitrary and capricious action.

As Drs. Bhattacharya and Kulldorff have explained, there is no legitimate public-health rationale for the Task Force to require proof of vaccination to participate in activities that do not involve care for high-risk individual. Joint Decl. ¶¶ 50-51.

## VI.   COVID-19 VACCINES CAN CAUSE SIDE EFFECTS, INCLUDING SEVERE ADVERSE REACTIONS

Though the COVID-19 vaccines appear to be relatively safe at a population level, like all medical interventions, they carry a risk of side effects. Those side effects include common, temporary reactions such as pain and swelling at the vaccination site, fatigue, headache, muscle pain, fever, and nausea. More rarely, they can also cause serious side effects that result in hospitalization or even death. Joint Decl. ¶¶ 25-26. The vaccines could cause other side effects that remain unknown at this time due to their relatively recent development. Joint Decl.¶¶ 26-27. No one should be forced to take a vaccine that is medically unnecessary, especially considering the risk of harm, *a risk that cannot be mitigated or prevented* once the vaccine is administered.

## VII.   PLAINTIFFS HAVE EXPERIENCED, AND WILL CONTINUE TO EXPERIENCE, CONCRETE AND PARTICULARIZED HARM AS A DIRECT CONSEQUENCE OF THE FEDERAL EMPLOYEE VACCINE MANDATE

As noted above, Plaintiffs work at diverse geographical locations performing a variety of federal jobs, holding positions ranging from electronics technician to air traffic controller to Secret Service agent. Although nothing turns on their years as federal

17

government employees, most of the named Class Representatives have spent more than a decade in federal service. Their careers are important to them, and not merely a means of financial support that can be replaced with alternative employment. Some Plaintiffs have worked remotely and, in light of COVID-era vagaries in federal, state, and local policies, may do so again.

All Plaintiffs have contracted COVID-19, recovered, and established, through recent serological testing, that they possess robust, naturally acquired immunity. Pappas Decl. ¶¶ 10-13. Recent semi-quantitative antibodies screening tests establish high levels of immune protection. Pappas Decl. ¶¶ 10-13. After having reviewed all of their lab results, Dr. Pappas has concluded that undergoing a full vaccination course would be medically unnecessary, create a risk of harm to Plaintiffs, and provide insignificant or no benefit either to them or to any similarly situated federal employees. Pappas Decl. ¶ 12. Accordingly, mandating that Plaintiffs receive a COVID-19 vaccine violates fundamental tenets of medical ethics. Noorchashm Decl. ¶¶ 8-35.

Yet, if they do not acquiesce and receive a vaccine, they face disciplinary action, including loss of employment. Accordingly, Plaintiffs' personal autonomy and livelihoods are being infringed upon. By threatening adverse professional and personal consequences, the Vaccine Mandate not only directly and palpably harms Plaintiffs' bodily autonomy, but it uses unconstitutional and unlawful force, loss of employment, to suborn these rights. The risk-avoidance benefits that the Task Force Guidance implementation provides, compared to the restrictions and intrusive options offered to Plaintiffs, are disproportionate. Given that naturally acquired immunity confers protection equal to or greater than that

18

provided by the vaccines (especially with respect to some of the WHO-approved vaccines that Defendants consider adequate to fulfill the Federal Employee Vaccine Mandate's requirements), that mandate is arbitrary and capricious.

## ARGUMENT

Plaintiffs and the class they represent have met all the requirements for a TRO and a preliminary injunction.  A plaintiff seeking a preliminary injunction must establish the following: (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury in the absence of an injunction; (3) that the threatened injury to the movant outweighs damage the proposed injunction may cause the opposing party; and (4) that granting the injunction is not adverse to the public interest. *Dialysis Patient Citizens v. Burwell*, 2017 WL 365271 (E.D. Tex. Jan. 25, 2017) (citing *Canal Aut. Of the State of Fla. v. Callaway*, 489 f.2d 567,  (5th Cir. 1974). The Court may employ a "sliding scale" approach, issuing the injunction upon a lesser showing of harm when the likelihood of success on the merits is especially high, or vice versa.  *Fla. Med. Ass'n v. U.S. Dep't of Health, Ed. & Welfare,* 601 F.2d 199, 203 n. 2 (5th Cir. 1979).

## I.    PLAINTIFFS HAVE A SUBSTANTIAL LIKELIHOOD OF SUCCESS ON THE MERITS

The level of protection conferred by Plaintiffs' robust natural immunity is equivalent to or perhaps superior to that acquired through the best available vaccines, such as the Pfizer and Moderna.  It is *stronger* than that provided by many that the Vaccine Mandate considers adequate, including the Sinovac, Sinopharm, and Janssen vaccines.  Given that the vaccines would provide no additional protection to third parties interacting with the

naturally immune (and would provide Plaintiffs themselves with no or insignificant benefit), yet carry the risk of side effects, including serious ones, forcing them to take a vaccine – at threat of loss of their careers and livelihoods -- violates fundamental tenets of medical ethics going all the way back to the Hippocratic Oath.  *I will follow that regimen which, according to my ability and judgment, I consider for the benefit of my patients, and abstain from whatever is deleterious or mischievous.'"*  Robert H. Shmerling, MD, *First, Do No Harm*, Harvard Health Blog, Harvard Health Publishing, Harvard Medical School (June 22, 2020), *available at* https://www.health.harvard.edu/blog/first-do-no-harm-201510138421 (last visited Aug. 3, 2021).  *See* Noorchashm Decl. ¶¶ 8-11, 19-21.

In this action, Plaintiffs seek to vindicate their statutory rights to decline a product authorized for Emergency Use only. *See Rodden v. Fauci*, Case No. ___, Dkt. 1 (S.D. Texas 2021), Count IV.  They also wish to vindicate their Constitutional rights to bodily integrity, informed consent and to remain free of unnecessary and unwanted medical treatment. *Id.* at Count I.  They will likely prevail on these counts, as the Government should not be able to override these substantial and fundamental rights in view of the paucity of health benefits resulting to Plaintiffs and those around them.  For similar reasons, they have a high chance of success under APA review.  *Id.* at Count V.

The Vaccine Mandate requires Plaintiffs and others similarly situated to receive a vaccine in order to continue working in federal employment without regard to their natural immunity or the advice of their doctors.  The Vaccine Mandate thus forces, or effectively forces, Plaintiffs and others like them into getting vaccines that FDA approved only for emergency use.

20

The EUA statute does not authorize mandatory administration of products available through its processes except as to soldiers under direct orders of the Commander-in-Chief. *See John Doe No. 1 v. Rumsfeld*, No. Civ. A. 03-707(EGS), 2005 WL 1124589, *1 (D.D.C. Apr. 6, 2005) (*Doe v. Rumsfeld)* (allowing use of anthrax vaccine pursuant to EUA "on a *voluntary* basis"). *See also* 21 U.S.C. § 360bbb-3(e)(1)(A)(ii). It expressly requires that recipients of products approved for use under it be informed of the "option to accept or refuse administration," and of the "significant known and potential benefits and risks of such use, and of the extent to which such benefits and risks are unknown." *Id*. Threatening employees with loss of their jobs if they decline an EUA vaccine violates this informed consent requirement. Indeed, in other contexts, we recognize that a similar threat negates informed consent. Under the principles advanced by the Vaccine Mandate there is no medical intervention that the Federal Government could not impose on its employees. Put otherwise, the Vaccine Mandate is more akin to the Godfather's "offer you can't refuse" rather than an "option to refuse." *Assets Work, Inc. v. City of Cincinnati*, 2003 WL 25463096 at *11 (W.D. Texas)(describing such an offer).

Notably, members of the armed forces can be forced to take EUA products if the President himself so orders. 10 U.S.C. § 1107a(a)(1). Had Congress intended the President – or anyone else – to be able to waive informed consent for civilians, there would be no reason to include this separate provision. There is, for example, no such provision that he may waive it for civilian workers or federal contractors.

21

In sum, since the Vaccine Mandate coerces Plaintiffs by making enjoyment of their constitutionally and statutorily protected consent rights---not to mention their employment—contingent upon receiving an experimental vaccine, it cannot be reconciled with the letter or spirit of the EUA statute.  *See* 21 U.S.C. § 360bbb-3.

Plaintiffs anticipate the Defendants may invoke an Office of Legal Counsel ("OLC") opinion released July 27, 2021 advising that the EUA does not preclude vaccine mandates for either private or public sectors.  *See* "Memorandum Opinion for the Deputy Counsel to the President," *Whether Section 564 of the Food, Drug, and Cosmetic Act Prohibits Entities from Requiring the Use of a Vaccine Subject to an Emergency Use Authorization* (July 6, 2021) (OLC Op.) at 7-13, *available at* https://www.justice.gov/olc/file/1415446/download (last visited Aug.1, 2021).  Of course, the separation of powers dictates that this Court is not bound by the OLC Opinion—an advisory opinion written *by* the Executive Branch *for* the Executive Branch.  *See Citizens for Responsibility & Ethics in Wash. v. Office of Admin.*, 249 F.R.D. 1 (D.C. Cir. 2008) ("OLC opinions are not binding on the courts[; though] they are binding on the executive branch until withdrawn by the Attorney General or overruled by the courts[.]") (cleaned up).

The OLC Opinion willfully avoids a plain language reading of the statute.  While recognizing that EUA products have "not yet been generally approved as safe and effective," and that recipients must be given "the option to accept or refuse administration of the product," the Opinion nevertheless maintains that the EUA vaccines can be

mandated.  OLC Op. at 3-4, 7.  According to OLC, the requirement that recipients be "informed" of their right to refuse the product does not mean that an administrator is precluded from mandating the vaccine.  All that an administrator must do, in OLC's view, is tell the recipient they have the *option* to refuse the vaccine.  *Id.* at 7-13.  But they don't really because they will be fired if they refuse.  That is the exact opposite of what a right to refuse entails.  OLC admits that its "reading … does not fully explain why Congress created a scheme in which potential users of the product would be informed that they have 'the option to accept or refuse' the product."  *Id.* at 10.  Nothing in the OLC Opinion addresses the fact that if it were taken as a blanket authorization for state and local governments to impose vaccine mandates, a vital portion of the EUA statute's text would be rendered superfluous.  *See, e.g., TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) ("It is a cardinal principle of statutory construction that a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.") (cleaned up).  Nor does the OLC Opinion explain why 10 U.S.C. § 1107a(a)(1), requires Presidential action to impose vaccines on service members, as the Department of Defense insists it does, yet non-service members according to OLC may be coerced with no such Presidential action.  See OLC Op. at 16 (citing DOD Instruction 6200.02, § E3.4 (Feb. 27, 2008)).  Unlike OLC, this Court must not ignore the plain statutory prohibition on mandating EUA products and it should be disregarded as a results oriented legal product.

Plaintiffs' constitutional claims also are likely to succeed on the merits. The Supreme Court has recognized that the Ninth and Fourteenth Amendments protect an individual's right to privacy. A "forcible injection … into a nonconsenting person's body represents a substantial interference with that person's liberty[.]" *Washington v. Harper*, 494 U.S. 210, 229 (1990). The common law baseline is also a key touchstone out of which grew the relevant constitutional law. *See, e.g., Cruzan v. Dir., Mo. Dep't of Public Health*, 497 U.S. 261, 278 (1990) ("At common law, even the touching of one person by another without consent and without legal justification was a battery."). *See also* W. Keeton, D. Dobbs, R. Keeton, & D. Owen, PROSSER AND KEETON ON LAW OF TORTS § 9, pp. 39-42 (5th ed. 1984).); *Schloendorff v. Society of N.Y. Hosp.*, 211 N.Y. 125, 129-130, 105 N.E. 92, 93 (1914) (Cardozo, J.) ("Every human being of adult years and sound mind has a right to determine what shall be done with his own body; and a surgeon who performs an operation without his patient's consent commits an assault, for which he is liable in damages.").

Subsequent Supreme Court decisions are explicit that the Constitution protects a person's right to "refus[e] unwanted medical care." *Cruzan*, 497 U.S. at 278; *King v. Rubenstein*, 825 F.3d 206, 222 (4th Cir. 2016) (recognizing same). This right is "so rooted in our history, tradition, and practice as to require special protection under the Fourteenth Amendment." *Washington v. Glucksberg,* 521 U.S. 702, 722 n.17 (1997). The Court has explained that the right to refuse medical care derives from the "well-established, traditional rights to bodily integrity and freedom from unwanted touching." *Vacco v. Quill*, 521 U.S. 793, 807 (1997).

24

When a government policy implicates a fundamental right, through coercion or otherwise, strict scrutiny "applies[;] a law will not be upheld unless the government demonstrates that the law is necessary to further a compelling governmental interest and has been narrowly tailored to achieve that interest." *Mohamed v. Holder*, 266 F. Supp. 3d 868, 877 (E.D. Va. 2017). *See also Does v. Munoz*, 507 F.3d 961, 964 (2007) ("Government actions that burden the exercise of those fundamental rights or liberty interests [life, liberty, property] are subject to strict scrutiny, and will be upheld only when they are narrowly tailored to a compelling governmental interest.").

Some courts fall back on *Jacobson v. Massachusetts,* 197 U.S. 11 (1905) for the proposition that rational basis level scrutiny only applies – generally leading to findings in favor of the Government – but this is the wrong standard, because *Jacobson* differed in crucial respects.  First, as the Court itself stated, one of the reasons it applied a low level of scrutiny was that the law at issue was the product of legislative action.  *See Jacobson*, 197 U.S. at 37. Second, the Court considered the deadliness of smallpox to be pertinent, as it was "an epidemic threatening the safety of all." *Id.* at 28.  Though COVID-19 is of course a serious disease it is less serious than smallpox and does not present a significant risk to the vast majority of individuals.  That is even more true now that those who wish to do so can get immunized.  Third, this was the action of a State with plenary police power not the Federal Government which has only enumerated powers.  Fourth, the penalty for not getting the vaccine was a modest fine of $5 rather than loss of livelihood.  Fifth, naturally-acquired immunity was not at issue in *Jacobson*:  there was no contention in the case that Jacobson had survived small pox or proof he had immunity to it.  Finally,

*Jacobson* was determined during an era in which schools often were segregated and states could ban interracial marriage.  It served as one of the justifications for the decision in *Buck v. Bell*, allowing the forced sterilization of mentally ill women.  Clearly, our concepts of bodily autonomy have changed since *Jacobson*, making blind reliance upon it misguided.

The Vaccine Mandate cannot survive APA review because it is unconstitutional, unlawful and arbitrary and capricious. The Mandate is poorly or defectively explicated in numerous respects.  Most importantly, neither EO 14,043 nor the Task Force Guidance document offers any explanation as to why naturally acquired immunity is not a permissible ground for federal employees to forego taking a COVID-19 vaccine in order to avoid discipline and keep their jobs.  Especially where naturally acquired immunity exists for individuals at a level equivalent to or superior to the least effective approved COVID-19 vaccine (*i.e.,* one of the mandate's approved foreign vaccines), this missing explanation renders the mandate arbitrary and capricious.  *See Motor Vehicle Mfrs. Ass'n of U.S. Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (agency action is arbitrary and capricious if the agency (i) "has relied on factors which Congress has not intended it to consider"; (ii) "entirely failed to consider an important aspect of the problem"; (iii) "offered an explanation for its decision that runs counter to the evidence before the agency"; or (iv) "is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.").  Additional arbitrariness issues abound.  For example, there is no indication that Congress intended to allow a policy like the Vaccine Mandate to authorize compliance via foreign vaccines that have not been approved by duly appointed regulatory authorities at the FDA.  Indeed, it is *inherently* arbitrary and

capricious to include on a menu of coercive vaccine options vaccines not approved for use in the United States.

The first factor, "a showing of a substantial likelihood of success on the merits, does not require that the movant prove his case." *Lakedreams v. Taylor*, 932 F.2d 1103, 1109 n.11 (5th Cir. 1991). The "purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981). Given this "limited purpose, and given the haste that is often necessary if those positions are to be preserved, a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits." *Id.* "[E]ven some likelihood of success can be enough to support the issuance of a preliminary injunction." *Ass'n of Taxicab Operators*, 760 F. Supp.2d 693, 696 (N.D. Tex. 2010) (citing, *Productos Carnic, S.A. v. Cent. Am. Beef & Seafood Trading Co.*, 621 F.2d 683, 686 (5th Cir. 1980)). A preliminary injunction is warranted if "the movant has raised questions going to the merits so serious, substantial, and doubtful as to make them fair ground for litigation and thus for more deliberate investigation." *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 543 (6th Cir. 2007); *Cho v. Itco, Inc.*, 782 F.Supp. 1183, 1185 (E.D. Tex. 1991). Plaintiffs easily meet that standard.

## II.   PLAINTIFFS WILL LIKELY SUFFER IRREPARABLE HARM SHOULD THE TRO NOT BE GRANTED

Plaintiffs' declarations in this case demonstrate that they will suffer irreparable harm in the absence of TRO or injunction.  Their constitutional rights to bodily integrity and to

27

remain free from unwanted medical treatment are infringed every minute that the Mandate remains in effect.  "[W]hen 'the threatened harm is *more than de minimis*, it is not so much the *magnitude* but *the irreparability* that counts for purposes of a preliminary injunction.'" *Dennis Melancon, Inc. v. City of New Orleans*, 703 F.3d 262, 279 (5th Cir. 2012) (quoting *Enter. Int'l, Inc. v. Corporacion Estatal Petrolera Ecuatoriana*, 762 F.2d 464, 472 (5th Cir. 1985)) (emphases added). Here, Plaintiffs' harm stems from both the constitutional injury this Order inflicts, the harm coerced vaccine will cause some (statistically speaking) and the unrecoverable financial damages that are likely to result.

First, should they give in and get the vaccine due to financial pressure or other concerns that accompany loss of a job, they will also suffer irreparable harm. As an Illinois court recently determined:

> But what of the December 31, 2021 vaccination requirement? "Obey now, grieve later" is not possible. If every union member complied and was vaccinated by December 31 (or otherwise exempt), they would have not grievance to pursue and there would be no remedy an arbitrator could award. An award of back pay or reinstatement cannot undo a vaccine. Nothing can. If that aspect of the City's policy was found to violate the collective bargaining agreements, the arbitral process could not restore the parties to their original positions. An award in favor of the police unions would be an "empty victory." "Obey now, grieve later" would be transformed into "obey now and forever"— without a meaningful opportunity to arbitrate. That constitutes irreparable injury.

*Fraternal Order of Police Chicago Lodge No. 7, et. al v. City of Chicago*, Case No. 2021 CH 5276, at 3 (Circuit Court of Cook County, Ill.) (Nov. 1, 2021)(internal citations omitted), *available at* https://news.wttw.com/sites/default/files/article/file-attachments/FOP%20v.%20City%20of%20Chicago%2011.1.21%20Order.pdf (last visited Nov. 3, 2021).

28

Second, the violation of constitutional limitations, standing alone, is sufficient to establish irreparable harm. *See Deerfield Med. Ctr. v. Deerfield Beach*, 661 F.2d 328, 338 (5th Cir. 1981). As established above, the Mandate unequivocally tramples on these rights. Accordingly, if this Court concludes that Plaintiffs have a reasonable likelihood of success on the merits of their constitutional claims, then irreparable harm is likewise established. 11A C. Wright, A. Miller, & Mary Kay Kane, *Federal Practice and Procedure*, § 2948.1 at 161 (2d ed. 1995) ("When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary.").

## III.   THE THREATENED INJURY OUTWEIGHS ANY HARM TO DEFENDANTS FROM GRANT OF THE TRO.

The third factor that must be considered is whether "the threatened injury outweighs any damage that the injunction might cause the defendant." *Jackson Women's Health Org. v. Currier*, 760 F.3d 448, 452 (5th Cir. 2014). That factor also cuts in Plaintiffs' favor. As noted above, if this injunction is not granted, Plaintiffs' injuries will likely be significant and irreparable. By contrast, Defendants' injury is largely limited to being unable to enforce an unconstitutional (and arbitrary) executive and administrative action. While the government generally has an interest in having its laws enforced, when a law "is likely unconstitutional, [government's] interests do not outweigh [Plaintiffs'] in having [their] constitutional rights protected." *Awad v. Ziriax*, 670 F.3d 1111, 1131-32 (10th Cir. 2012); *Coalition for Economic Equity v. Wilson*, 122 F.3d 692, 699 (9th Cir. 1997). Importantly, we are not even dealing with *a law*, we are dealing with an executive action imposed *outside of the legislative process.*

29

Any argument that the Government has an interest in curbing the spread of SARS-CoV-2 is vitiated by the ample evidence that those with natural immunity neither spread Covid-19 nor suffer adverse effects with greater frequency than the vaccinated.   That is particularly true given that the Vaccine Mandate permits employees to receive inferior foreign vaccines that operate at an efficacy of no greater than fifty percent.

## IV.   THE GRANT OF A TRO WILL SERVE THE PUBLIC INTEREST

If the Court finds that Plaintiffs have demonstrated a substantial likelihood of success on the merits of their constitutional claims, it should grant the preliminary injunction because "it is always in the public interest to prevent the violation of a party's constitutional rights." *Jackson Women's Health Org. v. Currier*, 760 F.3d 448, 458 n.9 (5th Cir. 2014) (citation omitted) (quoting *Awad*, 670 F.3d at 1132; *N.Y. Progress & Protection PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013) ("[T]he Government does not have an interest in the enforcement of an unconstitutional law.") (cleaned up).

But even if the Court finds that Plaintiffs only have a substantial likelihood of success on the statutory claims, those statutes demonstrate a strong public policy in favor of informed consent with respect to medical procedures and in opposition to arbitrary and capricious administrative action.

## CONCLUSION

The Court should issue a TRO and Preliminary Injunction, enjoining Defendants from enforcing the Vaccine Mandate against Plaintiffs and those similarly situated.  A form of Order is submitted herewith.

Respectfully submitted,

/s/ John J. Vecchione
_____

John J. Vecchione
Senior Litigation Counsel
Virginia Bar # 73828
John.Vecchione@ncla.legal
*Motion as Attorney-in-Charge Pending*


/s/ Jenin Younes
_____

Jenin Younes*
Litigation Counsel
New York Bar # 5020847
Jenin.Younes@ncla.legal
*Admission to this Court forthcoming*
* Admitted only in New York.  DC
practice limited to matters and
proceedings before United States courts
and agencies.  Practicing under members
of the District of Columbia Bar.

/s/ Harriet Hageman
_____

Harriet Hageman
Senior Litigation Counsel
Wyoming Bar # 5-2656
Harriet.Hageman@ncla.legal
*Admission to this Court Forthcoming*


_____


NEW CIVIL LIBERTIES ALLIANCE
1225 19th Street NW, Suite 450
Washington, DC 20036
Telephone: (202) 869-5210
Facsimile: (202) 869-5238


/s/ *Robert Henneke*
_____

ROBERT HENNEKE
Texas Bar No. 24046058
TEXAS PUBLIC POLICY FOUNDATION
901 Congress Avenue
Austin, TX 78701

31

Telephone: (512) 472-2700
Facsimile: (512) 472-2728
rhenneke@texaspolicy.com

*Attorneys for Plaintiff*